THE STATE OF NEW JERSEY, RESPONDENT, v. HAROLD
AULD, DEFENDANT-APPELLANT.

Argued June 13, 1949—Decided June 30, 1949.

*Mr. Irvin M. Lichtenstein* (*Mr. John L. Morrissey,* attorney) argued the cause for the defendant-appellant.

*Mr. Mitchell H. Cohen,* Prosecutor of the County of Camden, argued the cause for the respondent.

The opinion of the court was delivered by

OLIPHANT, J. Defendant was convicted in the Camden County Court of murder in the first degree, without recommendation of imprisonment for life, and sentenced to death. This is defendant's second conviction and death sentence for the same crime, the judgment of conviction in the first trial having been reversed for trial errors.

The cause is before us by virtue of *article 6, section 5, paragraph* 1 (c) of the Constitution and *Rule* 1:2–1(c) of this court.

A detailed resume of the facts will serve no useful purpose. It will suffice to say that the nude body of the victim, Margaret McDade, was found in a cistern connected with the sanitary sewerage pumping station in the Borough of Haddon Heights on August 19, 1945. There were numerous lacerations on the face, legs, limbs and lower extremeties. A cut on her lip was over one inch long, there were scratch marks on the entire left side of the body and several scratch marks on the inner aspect of the right thigh just below the private parts, parallel to each other, which, it was testified, had the appearance of finger nail scratches. The autopsy revealed contusions, lacerations and tearings of the private parts, tears with hemorrhage in the hymen and loose center teeth.

The defendant immediately after his arrest, upon interrogation, readily admitted he had been with decedent in the vicinity of the pumping station and after endeavoring to have intercourse with her, which he claimed she consented to, she screamed whereupon he hit her in the mouth. She went limp, he felt her pulse, found there was none, then to hide all evidence of the crime stripped her, carried her body to the cistern and threw her in.

The medical examiner concluded that death was due to suffocation together with the shock produced by the contusions and lacerations of the body. He gave as his opinion that violent force had been used either in the act of intercourse or attempted intercourse.

The jury from the evidence adduced could have found the deceased met her death on August 15, 1945, at the hands of

the defendant in attempting to rape her, and upon her resisting striking her in the face after which she lost consciousness and that he then threw her into the cistern.

We will deal with the points raised by the defendant in the order in which they are set forth in the brief and were presented on the oral argument.

Unfortunate, inexcusable and irregular incidents amounting to bad procedural practice occurred during the course of the trial of the case. Neither the Judge, the Prosecutor of the Pleas or counsel for the defendant should have allowed these situations to have arisen. They are made the basis of the first ground alleged as error for which it is claimed the judgment should be reversed.

The defendant urges his constitutional rights were violated by the action of the trial judge in having privy communication with the jury not in the presence of the defendant, as well as hearing arguments on motions directed to the admissibility of evidence, and in some instances on proffers of proof, in his chambers and out of the presence of the defendant.

The jury had been charged and retired. After about an hour the judge, in chambers, advised the prosecutor and counsel for the defendant, who was not present, that he had been requested by the jury to write on a piece of paper the five possible verdicts, one of which, in the charge, they were instructed they could return. This request had been conveyed to the judge by a court constable. The court advised counsel he had consulted with the reporter and had him read back from the stenographic notes what those possible verdicts were and he then wrote them down on a piece of paper. The paper contained the five possible verdicts which were *verbatim* as contained in the charge and merely repetitious thereof. He then asked of counsel "Do you have any objection to the jury having this paper for their use?" Defendant's counsel replied he had no objection and said "I am willing for them to have that piece of paper." The record does not disclose what thereafter happened but there appears to be no doubt the constable transmitted the paper writing to the jury.

■ While the communication of the judge with the jury was improper we are convinced, under the facts exhibited, it does not amount to reversible error. As said the written communication repeated, *verbatim*, what had been charged in open court with the defendant present. It added nothing to nor emphasized anything contained in the charge. The defendant could have suffered no prejudice. Defendant's counsel did not object but readily consented to this unusual manner of privy communication with the jury by the trial judge.

■ If the record showed affirmatively the defendant had been prejudiced by the improper ·communication there would be reversible error. Likewise if the record failed to show whether or not the communication was prejudicial it would be presumed to be so, and be cause for a reversal. "On the other hand if the record shows affirmatively that the communication had no tendency to influence the verdict the judge's impropriety in communicating with the jury out of the presence of the defendant does not require a reversal. *LaGuardia v. State,* 58 *A.* 2d 913 (*Md. Ct. of App.* 1948); *Dodge v. United States,* 2 *Cir.,* 258 *Fed.* 300, 7 *A. L. R.* 1510; *Outlaw v. United States,* 5 *Cir.,* 81 *Fed.* 2d 805."

*Commonwealth v. Kelly,* 292 *Pa.* 418, 141 *A.* 246 (*Pa. Supp.* 1928), was a case very similar to the instant one. That involved the trial of an indictment for murder in which the trial judge in chambers received a written communication from the jury after which further written instructions were given it. The instructions were not submitted to counsel nor were they given to the jury in the presence of either the defendant or his counsel. The court held the judgment should not be reversed unless "The court is convinced not only that error was committed, but also that such error did in ·all probability harm the defendant."

Reliance is placed by the defendant on the opinion of the former Supreme Court in *Leonard's of Plainfield, Inc., v. Dybas,* 130 *N. J. L.* 135 (*Sup. Ct.* 1943). That case is clearly distinguishable. There the trial judge entered the jury room alone and gave supplementary instructions to the jury in the absence of defendant and his counsel. These instructions

were not recorded and the appellate tribunal was unable to say whether their effect was prejudicial or otherwise. So likewise is *State v. Duvel,* 4 *N. J. Misc.* 719 (*Sup. Ct.* 1926); affirmed, 103 *N. J. L.* 715 (*E. & A.* 1927), clearly distinguishable on the facts.

■ With respect to the contention there was reversible error in that the defendant was not present when the communication was discussed with counsel, the supplemental charge given to the jury, and also when arguments were had in chambers respecting the admissibility of evidence and proffers of proof this is convincingly and effectively disposed of by the rule laid down in *State v. Nardella,* 108 *N. J. L.* 148 (*E. & A.* 1931). There the defendant was convicted of murder in the first degree and had excepted to a re-reading of a portion of the charge to the jury in the temporary absence of defendant. Such a procedure was held not to be error, no step original in its character being taken. The court said "The test is whether anything occurred in his absence new to the proceeding and in conflict with his right to be confronted by the witnesses, to be represented by counsel, and to maintain his defense upon the merits."

■ From the record before us we find no defeat of or interference with the defendant's right to maintain his defense on the merits and no prejudicial error by reason of his absence from any stage of the trial. All exhibits dealt with in chambers were marked only for identification and later marked in evidence in open court. The test, was the presence of the defendant a postulate of justice was fully met.

No objection to the procedure followed was made by counsel nor was any request made that the defendant be present. A defendant has no absolute right to be present on each occasion when questions of law are argued and any right which he may have may be waived by him or his counsel. *United States v. Johnson,* 129 *Fed.* 2d 954. As therein said, "The defendant must be deemed to have the absolute right to hear everything which the jury hears if he is to protect himself * * *. He must be present when the jury is present and is receiving evidence. If he is, then the trial meets the substance of the strin-

gent test laid down by Mr. Justice Roberts in his dissenting opinion in *Snyder v. Massachusetts,* 291 *U. S.* 97, at *p.* 129, 78 *L. Ed.* 674, 54 *Sup. Ct.* 330."

The most searching and elucidating exposition of the law on the subject is contained in the opinion of Mr. Justice Cardozo in the *Snyder case.* He there said, "A defendant in a criminal case must be present at a trial when evidence is offered, for the opportunity must be his to advise with his counsel * * * and cross-examine his accusers." He further stated the presence of a defendant is a condition of due process only "to the extent that a fair and just hearing would be thwarted by his absence." And in concluding his opinion he succinctly stated the principal here involved when he said "The law, as we have seen, is sedulous in maintaining for a defendant charged with crime whatever forms of procedure are of the essence of an opportunity to defend. Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof. But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

It is asserted our *Rule* 2:10–2 requires the defendant to be present at every stage of the trial, and that this rule has the force and effect of law and assumes the status of a constitutional provision. This is a procedural rule and the violation of such a rule is not sufficient to cause a reversal unless prejudicial error is shown in its violation. The defendant has further failed to take into consideration *Rule* 1:2–19(b) which provides "No judgment given upon any indictment shall be reversed * * *. For any error except such as shall have prejudiced the defendant in maintaining his defense upon the merits."

Conceding the procedure here to be irregular both as to the privy communication of the judge with the jury and the absence of the defendant at some stages of the trial, which we are compelled to do, the sole test is whether such irregu-

larities prejudice the defendant in maintaining his defense on the merits. We conclude it did not.

██ ██ When arraigned the defendant pleaded "insanity." The court refused to enter such a plea and caused one of "not guilty" to be entered. It is now contended this constituted reversible error and that the court was under a duty, by virtue of the plea, to conduct an inquiry or investigation of the defendant's present sanity.

There is no such plea as "insanity." See *Rule 2 :5–2.* Justification for the plea as originally made is alleged to be found in *Rule 2 :7–9* (e) but the clear meaning of that rule is that there may be a plea of "not guilty" by reason of insanity. Such insanity relates to the time of the commission of the crime. Defendant's plea did not pertain to his then present state of mind but that existing at the time of the crime.

One unable to comprehend his position, to consult intelligently with counsel and plan his defense cannot be put to trial. If the condition of a defendant's mind is brought into question in this respect at the time of pleading or at trial, either from observation or at the suggestion of counsel the question should be immediately settled. The court can itself enter upon the inquiry or submit the question to another jury impaneled for that purpose. *State v. Peacock,* 50 *N. J. L.* 34 (*Sup. Ct.* 1887) ; reversed on other grounds, 50 *N. J. L.* 653 (*E. & A.* 1888) ; *State v. Noel,* 102 *N. J. L.* 659 (*E. & A.* 1926).

Outside of the fact of the plea itself there was nothing to warrant any investigation into the sanity of the defendant. The fact he entered his plea himself while represented by counsel and thereafter actively participated in the trial itself, conducting himself in what appears to have been an entirely normal fashion, that his counsel never suggested any present insanity or any inability of the defendant to properly co-operate with him and that defendant's own psychiatric experts testified his mental condition was one of sanity lends no support whatever to this argument. We hold it without substance.

██ ██ It is next urged by the defendant that the trial court committed reversible error in not charging the jury that

in the commission of a rape, consent may not be withdrawn during the act of intercourse. The court fully and correctly charged all of the elements constituting the crime of rape. The jury was further instructed that consent could be withdrawn at any stage "during the preparatory acts." The general rule may be summarized as follows: Consent must precede the penetration. *Burdick, The Law of Crime, Vol. 2,* § 484, at *p.* 235. See 44 *Am. Jur., "Rape,"* § 8, *p.* 906; 52 *C. J.,* § 26, *p.* 1017, and *State v. McCaffrey,* 63 *Iowa,* 479, 19 *N. W.* 331 (*Ia.* 1884).

Furthermore, with respect to this point there was no specific request to charge, and no objection to the charge as given. *Rule* 2:7–8(b). It is settled law that the failure to charge a proposition of law, even though applicable to the facts in the case, cannot be made the basis for an assignment of error or of a cause for reversal in the absence of a request to charge. *State v. Capawanna,* 118 *N. J. L.* 429 (*Sup. Ct.* 1937) ; *State v. Yevchak,* 130 *N. J. L.* 584 (*Sup. Ct.* 1943).

It is next said, under point 4, that defendant's constitutional immunities from self-incrimination were violated by requiring him to submit to mental examinations prior to trial and by introduction into evidence of statements which he made to the examining physicians.

The purpose of the federal constitutional provision against self-incrimination is not applicable to our criminal procedure and has not been adopted in our Constitution, "yet the doctrine of the clause, so far as it expresses the rule of the common law as we have adopted it, is the rule of our courts in the admission of evidence in criminal cases. It has been declared in this court that the doctrine of the common law in that respect has full force, and that no person can be compelled to be a witness against himself, *State v. Zdanowicz,* 69 *N. J. L.* 619 (*E. & A.* 1903). But we recognize the admissibility of voluntary confessions or admissions by the accused, taking care that they have not been induced by threats or by direct or implied promises. *Roesel v. State,* 62 *Id.* 216 (*E. & A.* 1898). But when an accused waives the privilege afforded by this rule and offers himself as a witness in his

own behalf, he may be cross-examined as other witnesses. *State v. Zdanowicz, ubi. supra."* *State v. Miller,* 71 *N. J. L.* 527 (*E. & A.* 1905); *State v. Grundy,* 136 *Id.* 96 (*Sup. Ct.* 1947).

A defendant who becomes a witness waives his constitutional privilege against self-incrimination as to the crime with which he is charged. *Raffel v. United States,* 271 *U. S.* 494, 70 *L. Ed.* 1054; *United States v. Johnson, supra.*

The right of a defendant to be protected against self-incrimination applies to involuntary subjection to the questioning and this case is devoid of anything showing that any statements made to the examining doctors were involuntary. The record is quite to the contrary. The doctrine set forth in *Commonwealth v. DiStasio,* 1 *N. E.* 2d 189 (*Sup. Jud. Ct. Mass.* 1936), is applicable here. There the court said, "There is nothing in the contention that by the examination the defendant was compelled to * * * furnish evidence against himself; in violation of *Art.* 12 of the Declaration of Rights. The defendant was not required by law nor by any mode of compulsion to talk with the examiner nor to answer his questions. The notion that a person accused may not be subjected to the observation of witnesses and jurors is a perversion of the rule against self-incrimination." In *State v. Genna,* 163 *La.* 701, 112 *S.* 655 (*Sup. Ct. La.* 1927), is this expressive language, "We fail to see wherein the accused was forced to give evidence against himself. He was forced to do nothing. He was looked at and spoken to; but even a cat may look at a queen and no one need answer when spoken to unless he wishes to do so."

On August 22 and August 31, 1945, the prosecutor anticipating a defense of insanity, which actually occurred, called in three psychiatrists who examined the defendant and who pronounced him sane when examined and legally sane at the time of the commission of the crime. In the course of their examinations the doctors questioned defendant concerning his life as well as with respect to the events surrounding the commission of the crime. The substance of this portion of the conversation was admitted into evidence over the objec-

tion of the defendant during the course of the doctors' testimony for the State on *rebuttal*.

Aside from all other considerations this testimony was proper to contradict the defendant. He had testified that after the alleged assault he did not have any further recollection until sometime during the following month when he found himself in the county jail. On cross-examination, he testified that he did not recall being examined by the psychiatrists above referred to. The opinion of the physicians, both for the State and for the defendant, was that a person in a state of amnesia could not recall events occurring outside the circumscribed period, and that a person who had been in that condition could not thereafter recall matters occurring during the period of amnesia. The examinations of the physicians were made within the period of claimed amnesia, and, therefore, if the defendant's statement concerning his unnatural recollective state was to be accepted as true, it would have been impossible, according to the accepted belief of the experts, for him to have recalled during the mental examinations, events which took place prior to the period during which the defendant claimed he was in a state of amnesia.

The three State psychiatrists testified that, in answer to questions propounded by Dr. Yaskin and the others, the defendant gave, in detail, information concerning happenings both inside and outside the claimed amnesic state. It was to the question by the prosecutor addressed to Dr. Yaskin requesting him, the doctor, to relate the conversation, that objection was made, which objection is made the basis of the appeal on this point. The court permitted the doctor to answer the question, "Will you take them (his notes) in your hand, doctor, and please tell us what this defendant, Howard Auld, said to you, and to Dr. Wilson and Dr. Spradley, at the time of the examination conducted on August 22, 1945?" The ruling of the court was that the statements made by the defendant were "material and evidential to contradict, if they do, the testimony of the defendant himself, that he was in a blank state or that he did not remember having submitted to such an examination, and further, on the ground that the

witness doctor prior hereto testified that if the defendant had told him that he had given a detailed account of his actions on the evening of August 14th and August 15th his opinion as to his sanity or insanity would be different than that which he testified to." The witness doctor referred to by the court was Dr. Calvin S. Drayer, a psychiatrist produced by the defendant. He said in cross-examination that his opinion originally given to the effect that the defendant was insane at the time of the alleged offense would have been different if at the time of examination the defendant had given a description of everything that occurred on the night of the crime.

The effect of this testimony and the purpose for which it was introduced was sufficiently circumscribed by the court.

 The last point made is that the verdict was contrary to law and the weight of the evidence. The contention is without substance or merit. We are satisfied, as was the jury, that the defendant at the time he committed the crime knew the nature and quality of the act he was doing, that he was able to distinguish between right and wrong and that therefore the legal test of mental responsibility was met. *State v. Graves,* 45 *N. J. L.* 203 (*Sup. Ct.* 1883); affirmed, 45 *Id.* 347 (*E. & A.* 1883); *State v. Noel, supra; State v. Molnar,* 133 *N. J. L.* 327 (*E. & A.* 1945); *State v. Cordasco,* 2 *N. J.* 189 (1949), 66 *A.* 2d 27.

 It is the settled law of this State in order to justify the setting aside of a verdict as being against the weight of the evidence, this must be so clear as to give rise to an inference it was the result of mistake, passion, prejudice or partiality. *State v. Cox,* 128 *N. J. L.* 108 (*E. & A.* 1942); *State v. Cole,* 136 *N. J. L.* 606 (*E. & A.* 1948); *State v. Cordasco, supra.* The credibility of the witnesses was for the jury as was the weight to be given the testimony. The verdict as returned by the jury was entirely justified in accordance with the facts adduced. The evidence pointing to defendant's guilt factually and legally was abundant, even overwhelming.

On the trial the defendant suffered no manifest wrong or injury in the admission or rejection of evidence, the charge of the court, or in any matter touching the conduct of the

trial and no error intervened which in anywise prejudiced the defendant in maintaining his defense upon the merits.

The judgment is affirmed.

WACHENFELD, J. (Dissenting.) The mutilated and nude body of Margaret McDade was found in a cistern located on Maple Avenue in Haddon Heights, Camden County, on August 19, 1945. The cause of death determined by an autopsy was suffocation and the contributing causes were multiple contusions, bruises and lacerations of the body, and shock. In the immediate area there were found two shoes, a red novelty hat, a red feather, an artificial flower, small metal bracelets, a pair of bloody pants, a slip, a dress and a pocketbook containing several items. These were the property of and had been worn by the decedent. The weeds had been trampled down as though caused by a skirmish.

On August 14, 1945, the surrender of Japan was being celebrated and the decedent and her friends and several sailors went to Bellmawr. She remained after the others left and met the defendant for the first time at the Fire Hall. They went to the Creek home, where the party was continued. The festivities broke up after one A. M. on August 15th, at which time the decedent left with the defendant, which was the last time she was seen alive.

Between two and three o'clock on the morning of August 15th the defendant was seen on Black Horse Pike. He was covered with blood. On the evening of August 15th and the following morning the defendant was seen by a number of witnesses who testified he had wide scratches or gouges on his face and hands. A mother and her daughter who lived within 123 yards of the pumping station where the body was found testified they heard terrifying screams of a woman at one-twenty on the morning of August 15th. They were so frightened they made no inquiry.

Police investigation resulted in the arrest of the defendant, who subsequently made a confession in which in substance he admitted meeting the deceased, going to the Creek home with her and from there to Maple Avenue, where he attempted

to have intercourse with her. She complained and hollered and he grabbed her by the throat and choked her and struck her. He knocked her unconscious, took off her clothes, carried her to the pumping station and dumped her in. The defendant was convicted and the penalty of death was imposed.

This brief resumé of the facts is sufficient to indicate the guilt of the accused and I think the jury was justified in its verdict. My difficulty is not with the evidence but with the procedure.

The appellant raises five different points on appeal which are disposed of in the main opinion and I am in accord with the conclusions there reached with the exception of the first point raised involving the appellant's constitutional rights in reference to the way and manner in which the supplemental charge to the jury was submitted.

About an hour after the jury had retired to deliberate, the judge announced he "had been notified that the jury had asked whether or not the court would write on a piece of paper the five possible verdicts that in the charge they were instructed they could return." The judge in his own handwriting wrote the five possible verdicts and forwarded it to the jury by the constable who had submitted the jury's request to him.

It is contended—and I think with merit—that the court under these circumstances should have ascended the bench and charged the jury in the presence of the defendant and his counsel.

In *State v. Duvel,* 4 *N. J. Misc.* 719 (*Sup. Ct.* 1926); affirmed, 103 *N. J. L.* 715 (*E. & A.* 1927), the jury forwarded a communication in writing to the judge which was received by the clerk, who submitted it to the trial judge by telephone, reduced the answers given to him by the trial judge to writing and delivered the same to the jury. It was admitted that the answers were a correct statement of the law; nevertheless the court held:

"We think that this procedure was so irregular and so likely to, be prejudicial to a defendant, and so charged with possibilities of harm and abuse as to require a reversal.

"All the authorities seem to require and insist upon judicial acts of this character being done and performed in open court."

In *Leonard's of Plainfield, Inc., v.. Dybas,* 130 *N: J. L.* 135 *(Sup. Ct.* 1943), the court, in considering instructions given by the trial judge to the jury without the presence of the attorney or the defendant, said:

"And it goes without saying that, if supplementary instructions are deemed necessary, they shall be given only in open court in the presence of the parties and their counsel, if they choose to attend, or after affording them an opportunity to be present. This was a requirement of the common law. * * * It would seem that the determinative is not their validity, but the manner of procedure. * * * Moreover, sound policy dictates that there be an adherence at all times to the essentials of trial procedure, and that there be no privy communication between the trial judge and the jury concerning the issues submitted for decision."

The *Duvel case, supra,* is followed in *State v. Weissman,* 5 *N. J. Misc.* 625 *(Sup. Ct.* 1927).

The prosecutor courageously admitted in his brief that "ordinary candor requires the State to concede that the procedure was somewhat irregular and not to be recommended as a general practice."

It is not pleasant to think of the taking of a life except in the precise mode prescribed by law. Here admittedly the proper procedure was not followed and I cannot vote for a conviction when a death penalty is imposed under these circumstances. In a capital case one of the basic rights of the accused is to have a public trial in which his right of personal presence is recognized and maintained and in which the best judicial procedure is rigidly and jealously enforced. It does not suffice to say that although admittedly the essentials of trial procedure were not adhered to, no injury or harm befell the prisoner. Even in *State v. Nardella,* 108 *N. J. L.* 148 *(E. & A.* 1931), the court said:

"It must be conceded that, in a capital case, the better practice is to have the defendant in court at all times during the trial. * * *"

In a capital case the prosecution has a constitutional obligation to abide by and adhere to the best judicial procedure.

Private communications between the court and jury without the presence of the accused cannot be substituted for it as was done here.

For these reasons I am to reverse the judgment below. Mr. Justice Heher authorizes me to say that he concurs in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, BURLING and ACKERSON—5.

*For reversal*—Justices HEHER and WACHENFELD—2.