69 N.J. Super. 566 (1961)
174 A.2d 605
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
MORRIS SACHS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 8, 1961.
Decided October 24, 1961.
*569 Before Judges CONFORD, FREUND and LABRECQUE.
Mr. Philip J. Mylod argued the cause for defendant-appellant (Mr. David Sachs of the New York Bar, on the brief).
Mr. Archibald Kreiger, legal assistant to Prosecutor, argued the cause for plaintiff-respondent (Mr. John G. Thevos, Passaic County Prosecutor, attorney).
The opinion of the court was delivered by LABRECQUE, J.S.C. (temporarily assigned).
Defendant appeals from a conviction of the crime of maintaining a gambling resort (N.J.S. 2A:112-3) entered in the Passaic County Court on a jury verdict. He also appeals from the subsequent denial of his motion in arrest of judgment or, in the alternative, for a new trial. Two other defendants in the joint indictment were acquitted by the jury.
*570 The reasons urged for reversal are: (1) denial of defendant's motion for acquittal; (2) the receipt of illegal testimony; and (3) improper communications with members of the jury.
The indictment charged that the defendant on or about October 25, 1959 "willfully and unlawfully did keep a place to which persons might resort for gambling and with intent that such persons might and should resort thereto for gambling * * *." N.J.S. 2A:112-3.
The State's case developed the following:
In response to a telephone complaint Andrew Soter, a Passaic County investigator, and Thomas Mahull and Joseph LaBarck, two members of the Paterson anti-gambling squad, made an investigation of activities at the Passaic County Citizens Club. Arriving at the address given, they proceeded some 20 feet up an alley adjoining the building, to a rear entrance. On knocking on the door and pushing a buzzer, a peephole in the door was opened and a man looked out. When they identified themselves as police, the peephole was closed and they heard someone inside say, "Cops, break it up." They continued to pound and push on the door and after about five or six minutes it was opened by a lookout or attendant and they were admitted into a vestibule which led to another door. In the vestibule there was a chair used by the man who had opened the door. They then knocked on the inner door and rang another buzzer for about two more minutes before they were admitted to the club room proper.
When they entered the club room they came upon about 35 men, some seated at tables and some standing. Some had cards in their hands while others did not. There were chips and cards on the tables and on the floor. There was a round table in the room covered with a green cloth and with a low-hanging light over it. Some five or six people were seated around the round table on which there were three decks of cards, about 100 chips of various kinds and colors, and a card-dealing box. Some of the chips had the *571 inscription, "Passaic County Citizens Club, ten cents in trade." No money was observed on the table or changing hands while the investigators were present, nor were any bets being made at that time.
When they entered the room one of the investigators, Detective LaBarck, testified as to the following conversation with the defendants, Sachs and War:
"* * * I stated to them, I said, `How come on a Sunday whenever I come to this place to make an investigation when we get complaints that gambling is going on in here, why is the club barricaded?'
I said, `During the weeks, I walk into this club and the doors are open and anyone can walk in.'
I said, `We have had numerous complaints, I was here a month ago and I stated to you fellows that this Sunday afternoon gambling that's going on in the club has to be stopped.'
Mr. Sachs says to me, `Well, I am an old man. What can I do? What can I tell you?'"
After that, Investigator Soter talked to the defendant. Sachs told him that he was the president of the club and in control of it, that Schultz was his assistant and that War had paid the rent for September and October 1959. (It later developed that the club had no president and that Sachs, not War, paid the rent.)
They then proceeded to search the premises and found a refrigerator containing some soda, milk and orange juice. The room contained, in addition, a candy counter and a steel cabinet. In the unlocked candy counter they found a National Racing Program (also known as a racing form or scratch sheet) dated October 23, 1959, and five pink slips which were identified as pool slips for betting on football games played on October 24, 1959. Two of these were players' copies indicating that bets had been made on them. In the cabinet, which had been locked, was found a ledger book containing a list of club members, some paid gas and electric bills, a paid telephone bill, two copies of bank money orders in payment of rent, a number of cigar boxes containing *572 decks of regular and pinochle playing cards, and some new decks of cards.
In trash cans and on the floor were found 12 additional pool slips for betting on football games played on October 24, 1959. In the kitchen was also found a dust covered frame and chart used in card playing. A total of $83 was found in the cash register and on the person of the defendant Sachs. Additional chips were also found on the premises.
Of the 33 persons, not including the defendants, who were found in the room, 15 were listed in the membership book. Of the remaining 18, 10 were residents of Paterson, 2 of Passaic and 1 each of Englewood, Fair Lawn, Haledon, Newark, North Bergen and North Haledon.
The heavy wooden doors through which the investigators had passed in entering the premises constituted the only entrance to the club. On the outer door there were two or three locks, a stout wooden crossbar made of 2 x 4's with iron handlebars, and a peephole. On the inner door there was another wooden crossbar and a one-way mirror. The rear windows in the room were covered with planks of wood.
The State introduced the testimony of a representative of the telephone company to the effect that the defendant had been billed for the club's telephone from January 3, 1958 to October 27, 1959. A representative of the electric and gas company testified that he had likewise been billed for the club's electric and gas service from 1953 to June 17, 1960.
At the conclusion of the presentation of the State's case, defendant moved for a judgment of acquittal on the ground that the facts adduced were insufficient to establish a prima facie case under the indictment. When the State's case is based upon circumstantial evidence, as here, the standard applicable upon such a motion is whether the evidence, viewed in its entirety and giving the State the benefit of all legitimate inferences therefrom, was such that the jury could properly find beyond a reasonable doubt that the defendant had committed the crime charged. State v. *573 Dancyger, 29 N.J. 76, 84 (1959). It has often been said that circumstantial evidence is not only sufficient but may also be "more certain, satisfying and persuasive than direct evidence." State v. Goodman, 9 N.J. 569 (1952), and frequently "more trustworthy than direct testimonial proof." State v. Rogers, 19 N.J. 218 (1955). This is particularly so in the case of an offense such as here charged, where direct evidence of the prohibited action is not often obtainable. On such a motion the court does not weigh the evidence but all legitimate favorable inferences of which the proof is susceptible are to be accorded the State's case in arriving at a determination of whether the evidence if believed, is sufficient to enable the jury to find guilt based on the criterion "beyond a reasonable doubt." State v. Goodman, supra; State v. Donohue, 2 N.J. 381 (1949); State v. Rhams, 14 N.J. 282 (1954); and State v. Rogers, supra. In coming to a determination, each piece of proof is not to be dealt with in severe isolation from the rest of the circumstances submitted but is to be judged and weighed as it relates to and is associated with all other relevant circumstances which comprise the State's case. Id., 19 N.J., at p. 232.
Viewed in its totality, the evidence adduced by the State was sufficient to call for a determination by the jury as to the guilt or innocence of the accused. The defendant had admitted to the investigators that he was the person in charge of the club. The location of the entrance to the premises, the security measures used to prevent entrance, and the equipment and evidence found on the premises, all tended to indicate that games of chance were being played. Although this is impliedly conceded by the defendant, he urges that the case is devoid of proof of the requisite elements of wager and reward, citing State v. Ricciardi, 18 N.J. 441, 444 (1955), and O'Brien v. Scott, 20 N.J. Super. 132, 137 (Ch. Div. 1952). True, none of the detectives saw any money passed and no bank or "cache" of money was found on the premises. But it is not necessary that *574 the accused be the "house" or "banker," or draw a "cut" from the games, to be guilty of the crime charged. The statutory crime is committed when the element of knowingly keeping a place where persons might and should resort for the purpose of gambling is combined with an intent that persons should resort to the place for the purpose of gambling. State v. Costa, 11 N.J. 239 (1953). Nor is it necessary that money actually pass at the time the activities are in progress, provided it is understood by the parties that payment of the amounts won is to be made thereafter. It is sufficient if the playing is for checks, notes, chips or instruments understood by those engaged in the game to represent value and afterwards to be exchanged for money. 24 Am. Jur., sec. 14, p. 408. Here some of the chips found indicated that each was good for "ten cents in trade." Whether they were being used with the understanding that they represented "money or other valuable thing" was a question for the jury.
The defendant points out that with the exception of the football pool slips, all of the paraphernalia found on the premises was usable for completely innocent purposes. But when placed in the setting of an entranceway consisting of two heavy, strongly locked and barricaded doors, the outer one furnished with a peephole and the inner one furnished with a one-way mirror, with a sentry on duty in between, the facts immediately suggest an illegal enterprise. 24 Am. Jur., sec. 43, p. 428; cf. note in 33 L.R.A. (N.S.) 549. Where there is added to this the boarded up windows, the delaying tactics in permitting the police to enter the premises, and the admonition to those inside, "Cops, break it up," the picture presented points strongly to gambling rather than the innocent playing of cards for fun and amusement. Commonwealth v. Blankinship, 165 Mass. 40, 42 N.E. 115 (Sup. Jud. Ct. 1895); Commonwealth v. Warren, 161 Mass. 281, 37 N.E. 172 (Sup. Jud. Ct. 1894). There was thus evidence from which the jury could have concluded beyond a reasonable doubt that gambling was going on on the premises.
*575 Defendant argues further that there was lack of proof of intent sufficient to take the case to the jury. But intent as a separate proposition of proof does not commonly exist. 2 Wigmore on Evidence (3d ed. 1940), sec. 242, p. 38. It must ordinarily be discovered in the evidence of the defendant's conduct in the surrounding circumstances. State v. Costa, supra. Since his connection with the club and his direct exposure to its activities were admitted, it was open to the jury to conclude that he knew of and permitted the gambling activities and that he intended that the persons found there should come there to gamble. Id., 11 N.J., at p. 247.
As to the football slips which were offered in evidence without objection, the fact that they were for games played on the previous day does not militate against the court's ruling or the jury's finding. On the contrary, they could well support a finding that the payoffs on these games were made or to be made on October 25, the day of the raid.
Whether the evidence presented by the State was strong or frail, if it was fairly susceptible of diverse inferences, a fact question was presented. State v. Marinella, 24 N.J. Super. 49, 54 (App. Div. 1952). Considered in its totality, we hold that it presented a case for the determination of the jury, rather than the court, and the motion for acquittal was accordingly properly denied.
The defendant next contends that the trial court improperly overruled objections to certain testimony of Detective LaBarck and declined to strike the same when moved to do so.
During the course of the trial, Detective LaBarck described at length the nature and use of certain football pool slips which were found in the premises. On cross-examination by counsel for the codefendants, War and Schultz, he was examined as follows concerning them:
"Q. And you don't know to whom the bets were made, do you? A. No, sir."
*576 Thereafter, over the State's objection and upon cross-examination by the same counsel, he testified:
"Q. And you don't know whether any of the men seated at the Counsel table (including defendant) knew anything about these bets or whom they were made by or  * * * A. On the ones that were found by Detective Mahull, as he stated, in a garbage can, I would say no, but the ones that were found in the control of Mr. Sachs "
Here counsel for the co-defendants and counsel for the defendant objected and requested that the witness' conclusion that some of the slips were in the custody of the defendant be stricken from the record. The court allowed the question and answer to stand. Later the cross-examination proceeded as follows:
"Q. The question now, Detective LaBarck, is: Can you tell us who used these slips to make a bet or receive a bet, if anybody? A. No, sir, I would honestly have to answer that I don't know."
And again, over the State's objection:
"Q. Can you tell us whether you can testify with certainty and under oath that anybody made a bet with any of these slips? * * * A. As I stated, these here two show that a bet had been made and I would, again, have to state my belief that either Mr. Sachs or Mr. Schultz were selling these pool tickets."
Counsel for War and Schultz objected and requested that the witness' answer be stricken as not being responsive. The objection was overruled and the answer was permitted to stand. Counsel for the defendant joined in the objection.
The testimony referred to was clearly improper. Detective LaBarck's qualifications as an expert on gambling were established and the receipt of his testimony as to the nature and use of the various items found in the club was proper. State v. Smith, 21 N.J. 326 (1956); State v. Rucker, 46 N.J. Super. 162 (App. Div. 1957). But his expertise ended *577 there. The conclusion as to who had custody or control of the pool tickets or who was selling them, was one for the jury's determination if and when called for, under the court's charge. Cook v. State, 24 N.J.L. 843 (E. & A. 1855); State v. Rabatin, 25 N.J. Super. 24 (App. Div. 1953). Such a conclusion was not one which depended on peculiar knowledge or experience, not common to the world. State v. Lederman, 112 N.J.L. 366 (E. & A. 1933); Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 142 (1950).
Before passing on to a determination as to the effect of the quoted testimony, we note that the first answers objected to were the subject of a motion to strike by counsel for the defendant. R.R. 3:7-8. He, however, failed to state his reason for the motion, unless we consider that he adopted the reason given by counsel for the co-defendants. The second was objected to only on the ground that it was not responsive. Aside from whether it was or not, the ground of non-responsiveness was available only to examining counsel. State v. Lang, 108 N.J.L. 98 (E. & A. 1931); State v. Bleefield, 115 N.J.L. 76 (Sup. Ct. 1935). Thus, we may reverse on the basis of this second answer of the witness only if it constitutes "plain error" affecting the substantial rights of the defendant. R.R. 1:5-1(a).
It remains to be determined whether the rulings of the trial court here complained of were of such a character as to require reversal. In the absence of a showing of plain error, such rulings must have been objected to for reasons which were made known to the court. R.R. 3:7-8. Incidental legal errors which creep into the trial of a case but do not prejudice the rights of the accused or make the proceedings unfair may not be invoked to upset an otherwise valid conviction. State v. Orecchio, 16 N.J. 125 (1954). Under such circumstances it would be grossly unjust to the State and to its people to grant a new trial, and our courts have not hesitated to deny such relief to defendants. Id., at p. 129.
*578 Such trial errors do not afford a basis for reversal unless it is apparent from consideration of the entire record that the defendant suffered manifest wrong or injury. R.R. 1:5-1(a); State v. Morriggi, 15 N.J. Super. 479, 481 (App. Div. 1951). The rationale of the rule is well set forth in Morriggi as follows:
"Due process of law implies the requirement of a fair and impartial trial in which there is a legitimate and decorous recognition of the substantial rights of the defendant. The judicial process, however, in its pragmatical operation is not always the mirror of impeccability and the mould of perfection. It is a human process. An appellate tribunal with its available opportunity to review the transcription of the proceedings studiously and critically may often discern in a case sub judice insignificant, unessential, or hasty rulings which upon mature consideration are deemed to have been unphilosophical and injudicious. To artificially inflate their materiality would serve only to impede the administration of justice."
On the other hand, where the legal errors complained of are of such magnitude as to prejudice the defendant's rights or, in their aggregate, have rendered the trial unfair, our fundamental constitutional concepts require the granting of a new trial. State v. Orecchio, supra. In such case, we cannot look at the proofs, "resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty." State v. Wolak, 26 N.J. 464 (1958). No matter how seemingly evident the guilt of the accused, he is entitled to a fair trial surrounded by all the substantive and procedural safeguards our legal heritage has provided.
Our review of the allegedly erroneous rulings by the trial court is thus not confined to ascertainment of whether error in fact has been shown, but has the broader reach of assessing the impact thereof, in the whole context of the proceedings, upon the fundamental rights of the defendant, to determine whether in that setting he suffered the manifest wrong or injury referred to in the rule. State v. Micci, 46 N.J. Super. 454 (App. Div. 1957).
*579 We have, therefore, examined the entire record below. From it, we note that the defendant categorically denied that he had observed gambling on the premises or that such gambling had taken place. In this he was supported by the testimony of his co-defendants. However, we also note from his testimony that, contrary to what he had told the prosecutor's detectives, he was not the president of the "club." There was no formal club. There were no officers, and no club meetings. There was no treasury and there was no bank account. There were no minutes and no dues. He had been there since 1946. He himself filed the applications for electric, gas and telephone service, had the bills sent to his home, and paid them himself. He paid the $100 monthly rent together with the $25 a week salary to his part-time assistant, Schultz. He handled all the club finances and all of his transactions were in cash. He bought and furnished the playing cards. He received no salary but kept whatever profit he made from the sale of sandwiches, soda, cigarettes, etc. Out of this he paid his own rent of $80 a month and the cost of his subsistence. He had no idea how many sandwiches or how much soda and other products he was selling. When the raid took place, there were no sandwiches on hand.
The evidence thus strongly indicated that the "club" was not a club in the usual sense, and that the defendant (or his employer, if any) did with it as he willed. When he applied for and obtained telephone service in January, 1958, he did so as the "Broadway Club." Later, apparently on his own say so, he changed the listing to the "Passaic County Citizens Club."
There was some contradictory testimony regarding a storage room on the premises. The State's testimony indicated that this room had no exit (at least, so it appeared). Sachs testified that it had an exit. There was some additional testimony that it led through a door into a washroom, containing a toilet and wash bowl, and then through other premises, to the outside. While this appeared to negate some *580 of the State's testimony, it also afforded a possible explanation for the failure of the investigators to obtain more evidence.
The first question complained of, noted above, was part of a somewhat lengthy cross-examination by the attorney for the co-defendants and was directed to the pool slips. The testimony which preceded it was as follows:
"Q. You can't tell us who had these, can you, Detective LaBarck? A. No, sir.
Q. You can't tell us who used these, can you? A. I cannot.
Q. You can't tell us, from your own knowledge, that any bets were made on these sheets or any of them of your own knowledge  I withdrew the question.
Isn't it fair to say that if you ventured an opinion as to whether any of these things were used to make bets, it would only be a conclusion on your part, an assumption? A. I would say that these two were used to make bets with.
Q. By somebody? A. These are the players' copies.
Q. By somebody? A. By somebody.
Q. You don't know by whom? A. No, I don't.
Q. And you don't know to whom the bets were made, do you? A. No, sir."
Counsel was apparently not satisfied with his answer and proceeded to press the witness further. His next question was:
"Q. And you don't know whether any of the men seated at the Counsel table (including defendant) knew anything about these bets or whom they were made by or "
The prosecutor then objected but the propounder of the question insisted upon an answer; whereupon, the witness said:
"A. On the ones that were found by Detective Mahull, as he stated, in a garbage can, I would say no, but the ones that were found in the control of Mr. Sachs "
Thereupon there was a motion to strike on the ground that the witness was stating a legal conclusion which he had no *581 right to state. There was no formal ruling by the court on the motion to strike, but the court called upon the witness to state what he meant by his answer. He explained as follows:
"By the Court:
Q. What basis do you have to say that they were in the control of Mr. Sachs? A. Mr. Sachs stated he is the president of this club and he is in charge with Mr. Schultz. Now, here is a candy case with a cash register on the top of it and these things  the scratch sheet and the ones  the football slips found by Investigator Soter were under their control."
After the explanation, examining counsel moved that "that be stricken" and the motion was denied. Counsel for the appellant only asked that his "objection" be noted. We assume that the objection was intended to relate to the motion to strike the answer not only to the court's question but the answer to the previous question.
Immediately afterwards, the witness reiterated that he would honestly have to answer that he did not know who used the football pool slips to make a bet or receive a bet.
The question should not have been asked in the first place. It called for an opinion as to the state of mind of the defendants. But there was no objection to the question by counsel for the defendant. He apparently chose to gamble on the answer. State v. Rhams, supra; State v. Manno, 29 N.J. Super. 411 (App. Div. 1954); State v. Picciotti, 12 N.J. 205 (1953). When the witness' answer was not to his satisfaction, he joined in the motion to strike. The rule then required him to state his reason for the motion. R.R. 3:7-8. The court was entitled to know the reason relied upon before ruling on the motion and thus to be in a position to purge the proofs of any extraneous and prejudicial elements. Burke v. Lincoln Transit Co., 37 N.J. Super. 433 (App. Div. 1955). Yet the present allegations of prejudice and incompetency were not even mentioned as a reason. The reason given by the attorney for the co-defendant, that it called for a "legal" conclusion, was patently *582 inadequate and appears not to have been pressed. There was likewise no objection by defendant to the court's question which followed. Not until it was answered  and again apparently not to defendant's liking  was objection made. Even then the objection was not supported by any reason.
In the absence of proper objections and reasons therefor, defendant cannot now take advantage of the court's failure to strike the offending testimony. In the absence of plain error, the field for argument of error on appeal is measured by the ground stated to the trial court in support of the action desired. Burke v. Lincoln Transit, supra, citing Apgar v. Hoffman Construction Co., 124 N.J.L. 86 (E. & A. 1940); see also, Garrison v. Newark Call Printing & Pub. Co., 87 N.J.L. 217 (E. & A. 1914); Williams v. Guerreri, 136 N.J.L. 60 (Sup. Ct. 1947). There is thus nothing presented for our determination. State v. Western Union Telegraph Co., 12 N.J. 468, 497 (1953). No allegation of plain error is made here and we find none.
But even had there been proper objections and reasons therefor, we fail to discern any manifest harm or injury to the defendant in view of the state of proofs. We cannot be sure as to exactly what the witness originally intended to say, since his answer was cut short by the objection. But assuming the worst, the status of the defendant and his assistant Schultz was established by other evidence and was not essentially in dispute. Cf. State v. DePaola, 5 N.J. 1, 14 (1950); State v. Goodman, supra (9 N.J. 569, 587); State v. Lisena, 131 N.J.L. 48, 51 (Sup. Ct. 1943). Sachs was the custodian of the premises who was in overall charge, and Schultz was his assistant who worked three days a week in his place. In connection with his work Sachs engaged in the sale of candy, cigarettes, soda and sandwiches. The candy counter and cash register used in this operation were the ones the witness was referring to. It was under this candy counter that these football pool slips, which bore evidence that they had been used in making bets, were found. It was to them that LaBarck was referring. While not *583 determinative of the issue here, it is significant that even had the court granted the motion to strike, there was still additional uncontradicted evidence to establish the point. It was the kind of issue which the jury most likely would have decided for itself without resort to the so-called "expert" opinion of the detective. Cf. State v. Butler, 32 N.J. 166, 178 (1960).
The summations indicate no reliance upon the criticized answers of the witness. There was no request to charge or caution the jury upon them, and no exception to the court's failure so to do.
We are not here confronted with an opinion as to the ultimate guilt of the defendant, such as was found in State v. Landeros, 20 N.J. 69 (1955). Schultz and Sachs were not charged with bookmaking or with selling or possessing football pool slips, even though proof of their doing so would have helped to establish their ultimate guilt under the indictment. The trial court in its charge carefully confined the issues to the offense charged and correctly pointed out the elements of the offense and the measure of proof required. It left to the jury's determination the factual disputes involved. The defendants were not prejudiced in the presentation of their case by the alleged error complained of. Although it affected both Schultz and Sachs, the jury's acquittal of one and its conviction of the other, while again not determinative, is some confirmation of this. We find that the defendant suffered no manifest wrong or injury from the rulings complained of. R.R. 1:5-1(a).
We turn next to consideration of the second item of testimony which defendant contends was illegally admitted. On further cross-examination by counsel for the co-defendant, and again over the prosecutor's objection, LaBarck was asked:
"Q. Can you tell me whether you can testify with certainty and under oath that anybody made a bet with any of these [football] slips."
*584 No objection was made on behalf of the defendant but the question was unanswered and was resubmitted again without objection, as follows:
"A. Can I honestly say if someone made a bet?
Q. Yes. A. These here two show that a bet has been made and I would again have to state my belief that either Mr. Sachs or Mr. Schultz were selling these pool tickets." (Emphasis added)
A motion was thereupon made by examining counsel to strike the answer as not responsive and was overruled. The witness obviously felt that he could honestly say that either Sachs or Schultz was making bets (i.e., selling pool tickets).
In the absence of an available objection there exists no basis for appellate review unless the challenged action qualifies as plain error. To do so, it must affect substantial rights of the defendant and be sufficiently grievous to justify notice by the court and to convince it that the challenged action, of itself, possessed a clear capacity to bring about an unjust result. State v. Corby, 28 N.J. 106 (1958).
Our examination of the record reveals ample evidence adduced by the State to indicate the operation of a gambling house with intent that it should be used for gambling, and to implicate the defendant therein. No present suggestion is made that the verdict of guilty is contrary to the weight of the evidence. Apparently counsel, in failing to properly note an objection, was satisfied that the answer was not sufficiently harmful to prejudice the defendant and that the jury would not be unduly influenced by it. Cf. Priest v. Poleshuck, 15 N.J. 557, 564 (1954). The failure to submit any request to charge on the subject or to except to the charge points to the same conclusion. Without further detailing the proofs, we find no such manifest injustice as would warrant a declaration that the failure of the court to strike the answer constituted plain error requiring reversal. State v. Corby, supra.
We now turn to consideration of the remaining ground urged for reversal: that there was improper communication *585 with members of the jury after the jury retired to deliberate.
The jury was a holdover one, and began its deliberations at approximately 3:00 P.M. on the day before Thanksgiving. At about 5:00 P.M. a juror knocked at the door and asked one of the bailiffs, Miss White, to send a message out. Miss White told her she would inform the court, but instead of doing so, she notified another bailiff, Hilco. Just before this, a Mr. Sidlow came to the door of the jury room in an excited state and asked to send a message to his wife, who was one of the jurors. Miss White and Hilco assumed that the juror who had spoken to Miss White was Mrs. Sidlow, and Hilco so informed the judge. Sidlow was then brought into the judge's chambers and explained that he had expected to go to work, and his wife had planned to pick up their son and drive to Idlewild Airport to meet an arriving friend. He wished to inform his wife that he had taken off from work, would pick up their son, make the trip to Idlewild and meet her friend. The judge directed Hilco to relay the message to Mrs. Sidlow. Hilco went to the door of the jury room and called for Mrs. Sidlow. A Mrs. Serafin approached carrying a message, followed by Mrs. Sidlow, and Hilco realized for the first time that the two messages did not involve the same juror. He said nothing, motioned the jurors back, closed the door and went to inform the judge.
The judge then instructed him to deliver Mr. Sidlow's message first, and then to take Mrs. Serafin's note. He again went to the door of the jury room, called for Mrs. Sidlow and gave her the following message:
"Your husband is leaving for Long Island. He will pick up your son. They will go to Idlewild Airport. They have your grand-daughter in the car with them. You are to go home when you are finished."
When this message was transmitted to the juror, her only answer was, "Good."
*586 Hilco then took Mrs. Serafin's note and brought it to the judge. It read as follows:
"Please call Armory 4-9042, Mrs. Coyle or Miss Coyle, and see if Vernon can get in the apartment. If he cannot get in the apartment, please ask Miss Coyle to let him call my mother and tell her to pick him up as soon as possible, because I am still on jury duty and I do not know when I will come home. I don't want him outside till real dark or maybe overnight. If Vernon is not around, please ask Miss Coyle to watch for him and give him the message to call my mother to pick him up."
The judge thereupon instructed the deputy court clerk to convey the message by phone, which was done. However, Mr. Serafin took the message and sent back word that his son was home and that Mrs. Serafin should call his mother the next day. This message was conveyed to the judge who directed Hilco to so advise Mrs. Serafin. Mrs. Serafin's only statement in reply was, "Oh, thank God."
All of these transactions took place out of the presence of and without the knowledge of counsel for the respective parties.
Subsequent to the rendition of the verdict, the defendant made a motion for the entry of an order in arrest of judgment or for the entry of judgment of acquittal n.o.v., or, in the alternative, for a new trial, citing as his grounds:
(1) the verdict was against the weight of the evidence;
(2) he was denied a fair trial by reason of the irregularities referred to above, and
(3) there was error in permitting certain testimony on the part of the witnesses Soter and LaBarck.
Testimony was taken before the trial judge as to the charge of irregularity during the jury's deliberations, and thereafter oral argument was had which was confined to reasons (2) and (3) above. Since there is no provision for judgment n.o.v. in our criminal practice rules and the arrest of judgment rule, R.R. 3:7-12 was clearly inapplicable, the trial judge properly treated the motion as one for a new trial *587 under R.R. 3:7-11. In disposing of the motion the court found that the actions complained of were harmless and innocuous, that they took place by direction of and under the supervision of the court, that they in no wise concerned matters involved in the case, that they had no capacity to influence the jury, and that the defendant was not prejudiced thereby.
Generally, the granting or denial of a motion for new trial rests in the sound discretion of the court and is not reviewable unless it clearly appears that the action taken constituted an abuse of discretion or represented a manifest denial of justice. Fisch v. Manger, 24 N.J. 66, 80 (1957); Kavanaugh v. Quigley, 63 N.J. Super. 153 (App. Div. 1960).
The statute applicable, N.J.S. 2A:74-7, describes the oath to be administered to the officers appointed to attend the jury. One portion of it requires the officer not "to speak to them, * * * yourself, except by order of the court, * * *." Initially, when the first juror, Mrs. Serafin, knocked on the door and told Miss White that she wished to send a message out, Miss White should have promptly informed the court. This was the course eventually followed by Hilco, the other attendant, when he finally became aware of it. In such cases, it is the duty of the attendant upon receipt of any message from a juror to communicate it to the court without comment to the juror. Kavanaugh v. Quigley, supra. Only in this manner can we rule out the possibility for error that is present in every unsupervised communication during the jury's deliberation.
Aside from this, the communications were passed in an entirely proper and legal manner. They concerned personal matters of an emergency nature. They were authorized and supervised by the trial judge in the exercise of the wide discretion vested in him. They were delivered in form and substance as directed by him.
It would have been wiser, of course, had these exchanges been conducted in open court, or at least with the knowledge *588 of counsel. It is unfortunate that this was not done, but defendant has not been able to point to any case in which this type of conduct has been held by our courts to be ground for reversal, and we have found none. In each of the reported cases cited by the defendant, the communications concerned matters pertinent to the issues at stake. Thus in Kavanaugh v. Quigley, supra, the court was not informed by the officer that the jury desired additional instructions. The jury asked for further instructions in State v. Duvel, 4 N.J. Misc. 719 (Sup. Ct. 1926), affirmed 103 N.J.L. 715 (E. & A. 1927), but there the clerk communicated with the trial judge by telephone and was given instructions over the phone which he took down and gave to the jury. In Guzzi v. Jersey Central Power & Light Co., 36 N.J. Super. 255 (App. Div. 1955), the jury again asked for further instructions and the court sent word in by the bailiff in response to the request for instructions. In Leonard's of Plainfield, Inc., v. Dybas, 130 N.J.L. 135 (Sup. Ct. 1943), the court went into the jury room for the purpose of giving instructions without counsel's being present or consenting thereto. And in Palestroni v. Jacobs, 10 N.J. Super. 266 (App. Div. 1950), the court sent a dictionary into the jury room without notice to the defendant.
The standard to be applied in such cases is whether the irregular act had the capacity to influence the result, not whether influence in fact resulted. If the record affirmatively shows that a party is prejudiced thereby, reversible error is present. If the record fails to show whether or not the irregularity was prejudicial, it is presumed to be so anyhow and to be cause for reversal. It is only when the irregularity is affirmatively shown to have had no tendency to influence the verdict that a reversal is not required. Kavanaugh v. Quigley, supra; State v. Auld, 2 N.J. 426 (1949); Panko v. Flintkote Co., 7 N.J. 55 (1951); Palestroni v. Jacobs, supra.
On the motion for a new trial, the trial court carefully inquired into the details of the communications. The *589 officers involved and another witness called by the defendant were thoroughly interrogated. From their testimony he found that the irregularities complained of had no tendency to influence the jury's verdict. We agree. Any momentary diversion from deliberation cannot be said to have been prejudicial. On the contrary, it was much more likely that by clearing up these personal and family problems which were disturbing two of the jurors on Thanksgiving Eve, the court cleared the air and removed obstacles which might otherwise have impeded them from giving complete and undivided attention to the task at hand. The suggestion that the messages referred to may have been coded communications, has no support whatever in the record. Cf. State v. Columbus, 9 N.J. Misc. 568 (Sup. Ct. 1931). The motion for a new trial was thus properly denied.
While we thus find that the facts here do not call for reversal, we nevertheless repeat what has been said before, that unless otherwise consented to by all counsel in the case, all communications with the jury should be in open court, preferably in the presence of counsel, and invariably so if the communication concerns the issues involved in the litigation. It may well be that, at times, conformity with these directions may entail some inconvenience, but inconvenience is not too great a price to pay for a fair trial.
Affirmed.