975 A.2d 1023 (2009)
409 N.J. Super. 40
STATE of New Jersey, Plaintiff-Respondent,
v.
Wendis ADAMES, Defendant-Appellant.
DOCKET NO. A-5671-06T4.
Superior Court of New Jersey, Appellate Division.
Submitted March 25, 2009.
Decided August 5, 2009.
*1024 Yvonne Smith Segars, Public Defender, attorney for appellant (William Welaj, Designated Counsel, on the brief).
Bruce J. Kaplan, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).
Before Judges PAYNE, WAUGH and NEWMAN.
The opinion of the court was delivered by
*1025 WAUGH, J.A.D.
Defendant Wendis Adames appeals from his conviction for the first-degree murder of his father and for third-degree possession of a weapon for an unlawful purpose, specifically the metal baseball bat with which his father was bludgeoned to death. He also appeals the resulting thirty-five year term of imprisonment, which was subject to the eighty-five percent parole ineligibility provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.
The issue at trial was not whether Wendis killed his father, but whether he was legally responsible for doing so based upon his alleged mental illness.[1]See N.J.S.A. 2C:4-1. For that reason, the outcome of the trial turned largely on the jury's evaluation of expert testimony concerning Wendis's mental health at the time of the homicide.
Because we conclude that the prosecutor improperly commented on Wendis's demeanor at trial during the cross-examination of one of his mental-health expert witnesses and again during summation, we reverse and remand for a new trial.

I.
The following factual and procedural background informs our consideration of the legal issues raised on appeal.

A.
In June 2003, Wendis, then nineteen-years old, was residing with his parents, Emilio and Delis Adames, in Perth Amboy. Emilio and Delis had two other children: Yvania, who was then twenty-one-years old; and Clari, who was eighteen-years old. Yvania and Clari did not live at their parents' home. Wendis and his parents resided on the second floor of a two-family house. Mercedito Placencia lived on the first floor of the house with his wife and two children.
One day in June 2003, Wendis returned home from work and was angered that his father had not taken out the garbage. Wendis and Emilio, who was not working due to a disability, got into an argument, which escalated into a physical altercation. Delis heard Wendis scream: "Papi, don't hit me!" Shortly after that, Wendis grabbed a baseball bat and returned to the room where the argument had taken place. Family friends intervened and Wendis dropped the bat and ran off. Yvania testified that she saw bruising on her father's head the next day.
Following that argument, Wendis moved out of his parents' house and lived with a family friend. Although he was employed, Wendis was unable to afford the rent and eventually moved back to his parents' residence. Emilio conditioned his return to the home on Wendis attending school and continuing his employment. Wendis enrolled in a vocational high school and was studying to become an electrician.
Yvania and Delis testified that in late May or early June 2004, Wendis started to act strangely. He wore mismatched clothing, went outside without shoes on, stopped cleaning his room, and sat laughing by himself. Wendis, who had apparently not been particularly religious, began collecting religious materials, wearing a cross around his neck, and carrying a Bible.
At trial, Yvania testified that, during this time period, Wendis was smoking marijuana almost daily. She also testified *1026 that a friend of Wendis told her that Wendis had experimented with phencyclidine (PCP) on June 10, 2004.
Despite his use of drugs, Wendis was apparently an average student with no disciplinary problems. He was expected to graduate in June 2004. Some of his teachers noted that he had become quieter and more reclusive following the school's spring break in April 2004. Wendis also began attending school "sporadically" and was "very dirty looking."
Delis testified that the relationship between Wendis and Emilio was strained. Wendis was upset that Emilio, who was suffering from three ruptured discs in his back, was not working. Delis stated at trial: "They were very quiet with each other. They just barely said `hello' to each other."
On June 11, 2004, around 8:00 p.m., Wendis was taken to the emergency room at the Raritan Bay Medical Center by his sisters and the Perth Amboy police because he was "having homicidal ideations towards" a friend. Wendis was also claiming to be a soldier of God on a mission and was insistent that his sister Clari was the Virgin Mary. After leaving Wendis at the hospital, Yvania returned to her parents' home. While there, she entered Wendis's room and discovered a "few" knives.
The nurse who treated Wendis described him as "irritable" when he was informed that he would not be allowed to leave. He informed her that he had used PCP. A drug screening was positive for marijuana use. However, Wendis was not tested for PCP because it was not a "routine" test. The nurse saw no reason to recommend Wendis for a psychological evaluation. Because Wendis was going to be kept in the hospital for observation, the nurse administered a sedative to calm him down.
The following day at 7:40 a.m., Wendis was examined by a second nurse. The nurse testified that Wendis was "[c]alm" and "[c]ooperative." Wendis told the nurse that he did "not want to hurt anyone" and that "[h]is sister made up those statements." The nurse checked Wendis at 9:30 a.m. and at noon. He testified that Wendis presented no signs suggesting that he was suffering from schizophrenia.
Wendis was evaluated by the hospital's attending psychiatrist, Dr. Boris Borodulin, at around 12:50 p.m. on June 12, 2004. Borodulin reported:
Patient admitted to me the use of marijuana and PCP and also at the time of the admission patient was agitated, angry, was delusional and religiously occupied. The urine for PCP was not tested but the drug screen was positive for cannabis. At the time of the evaluation patient denied any history of psychiatric treatment in the past. Denied any history of suicidal attempts or self-[mutilation] and denied any legal problems in the past. [In h]is mental status examination patient was cooperative, pleasant. His speech was relevant and coherent. He was oriented to all three specimens to the time, place and person. He denied hallucination. Denied any auditory or visual hallucinations and no delusional ideas [] at least at the time of the evaluation. His [mood] was neutral with a full range of affect. He denied feeling depressed. Denied use of alcohol. And denied suicidal or homicidal ideas. Presented with a fair insight in judgment. He admitted to me that [] the drug use is an issue and we discussed with him treatment. He agreed to go to an alcohol and drug treatment program in Perth Amboy where he was given a referral by the social worker.
Borodulin diagnosed Wendis with adjustment disorder, which is "a diagnosis *1027 commonly used especially in the emergency room setting," to signify a "temporary disturbance" caused by something other than a psychiatric disorder. Borodulin testified that Wendis did not "meet the criteria for inpatient treatment" and was therefore not involuntarily committed. Wendis was discharged from the hospital the same day and given a referral to a drug addiction treatment center.
The following day, June 13, 2004, Yvania was at her parents' house watching television with Wendis. Suddenly, Wendis jumped up and grabbed a knife from the top of the entertainment center. He headed towards his father's bedroom. Wendis stated: "Let's do this." Yvania asked him: "Do what?" Wendis responded "It's time." Yvania took the knife away from Wendis and asked him what he was doing. Wendis responded that his father had put the knife on the top of the entertainment center the night before "because he heard noises." Yvania questioned Emilio about the knife and he denied having placed it in the living room.
On the afternoon of June 16, 2004, Emilio, Delis, and Wendis were all at home. Delis had a headache and was taking a nap. Emilio went next door to discuss a car insurance question with the neighbors, John and Amanda Jones, leaving Wendis at home. The Jones' ten-year old daughter, J.J., and her friend, S.R., were playing in the back yard. The Adames and Jones' backyards were separated by a fence that did not block the view from one yard to the other.
Shortly after Emilio left the Jones' house to return home, J.J. heard him scream for help and yell out for Wendis to stop hitting him. J.J. looked into the Adames' backyard and saw Wendis hitting Emilio with a metal baseball bat. S.R. testified that she heard the bat hit what sounded like the floor. She looked into the Adames' backyard and saw a younger-looking man speaking angrily in Spanish as he hit an older-looking man in the head with a metal baseball bat.
J.J. ran into her house and told her mother what she had seen. Amanda Jones ran outside and saw Wendis repeatedly hitting Emilio in the head with a baseball bat. She testified that Wendis had no expression on his face, "[n]one whatsoever." She also noted that Emilio was unarmed. Amanda told her mother to call the police.
Upon hearing J.J.'s screams, John Jones also ran outside. He saw Emilio laying on the ground with his head "busted all up" and Wendis hitting him on the head with a baseball bat. He testified that Wendis was smiling as he hit Emilio with the bat.
John asked Wendis why he was hurting his father, but Wendis told John to leave him alone. John, along with his stepson, entered the Adames' backyard and tried to take the baseball bat away from Wendis. However, they backed off when it appeared that Wendis was going to come after them with the bat.
Delis was awakened from her nap by her downstairs neighbor. She looked into the backyard and saw Emilio laying on the ground and Wendis holding a baseball bat over him.
Placencia was alone on the first floor of the home when he heard the commotion in the backyard. He walked to the back of the house and saw Wendis approaching the house holding a baseball bat. He also saw Emilio lying on the ground in the backyard with a large amount of blood around his head. Realizing what had happened, Placencia shut the back door to prevent Wendis from getting in the house.
Wendis attempted to get into the house through a partially opened window. Placencia tried to shut the window to keep *1028 Wendis out. When Wendis asked Placencia to let him in, Placencia responded: "If you give me the bat, I'll let you in." Wendis complied and entered the house.
As soon as Wendis was in the house, Placencia grabbed him and held him from behind. Wendis asked Placencia: "Why are you holding me? I don't have any problems with you." Placencia responded: "Do you want any more trouble? Look at what you've done. That is your father. That was your father, who used to give you money, food, everything." With a smile on his face, Wendis asked: "What did I do?" Placencia held Wendis until the police arrived.
Perth Amboy Police Officer Rafaelito Cruz was dispatched at approximately 5:20 p.m. to the Adames' home. When he arrived at the house, there were several people standing outside yelling: "[H]e hit him with the baseball bat." Cruz went to the backyard where a second crowd had gathered. He saw Emilio laying face down on the ground. He approached Emilio and "observed brain matter protruding from his head, and a pool of blood around his head." Cruz did not see any signs of movement or breathing from Emilio. He called for assistance from a medical unit.
Someone directed Cruz's attention to the back of the house. Cruz approached and saw Placencia holding Wendis in a "bear hug." Upon instruction from Cruz, Placencia released Wendis and opened the back door. Cruz entered the house and as he approached, Wendis put both of his arms "[s]traight out in front [of him], about chest high. Both hands were closed, like a fist." Cruz described Wendis as "very calm" and having a "blank look." He offered no resistance when Cruz handcuffed him.
Cruz was joined at the scene by several other officers and paramedics. He placed Wendis in the back of a police car and stayed with him for approximately thirty minutes. During this time, Cruz did not engage Wendis in conversation. He testified that Wendis did not exhibit any strange behavior while he sat in the police car. Rather, "[h]e was just sitting there."
Wendis was eventually transported to the Perth Amboy Police Headquarters. Once there, he waived his Miranda[2] rights and signed a notification of rights form. Perth Amboy Detective Joseph Sciortino and Lieutenant John Maslak of the Middlesex County Prosecutor's Office questioned Wendis. The interview session commenced at approximately 7:30 p.m. and lasted only fifteen to twenty minutes. Sciortino described Wendis as being "very relaxed, composed, and he actually yawned, and stated that he needed to go to school tomorrow, the next day, to take an exam." When asked if he knew why he was at the police station, Wendis "indicated he was in his room. He heard a loud noise, went outside, saw his father on the ground, somebody held him, the police came. He indicated that he wasn't responsible for what happened." Neither Sciortino nor Maslak detected any smell of marijuana or alcohol on Wendis. Maslak testified that, during the interview, he had no "suspicion that [Wendis] might have had mental problems."
The medical examiner determined that Emilio's cause of death was severe craniocerebral injuries due to blunt force trauma. The autopsy revealed multiple blunt force trauma to the head, chest, back, and extremities.
On June 18, 2004, Wendis was tested for drug use. A blood screen tested positive for marijuana; a urine screen also tested *1029 positive for marijuana and negative for PCP.

B.
Wendis was indicted for first-degree murder, N.J.S.A. 2C:11-3(a)(1),(2), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). Wendis pled not guilty and raised mental incapacity under N.J.S.A. 2C:4-1 as an alternative defense. At trial, both the defense and the prosecution presented extensive expert testimony as to Wendis's mental health.
Dr. Jonathan Mack, an expert in neuropsychology and forensic psychology, testified on Wendis's behalf. Mack evaluated Wendis in June 2005 and January 2006, reviewing all relevant documentation and medical records. Wendis maintained that on June 16, 2004, he had gone to school, returned home, and was in his room before being grabbed by the police. Wendis told Mack:
[T]he mother raised the son to kill the father. My mother and God was from the planet Pluto. And Pluto and Mars, they don't get along. And the ones from Mars melt the ones from Pluto.
Now, it's my mom and God, and God is supposed to be your Pluto. And he was trying to save me. And I was conversating with the voices, and the God from Pluto was telling me that his son could help me. And I asked the voice to let me have him. And the voice, who was supposed to be my mother, messed up and she was going to kill me. And I felt somebody grabbing my testicle and pulling them up inside me, and I was inside me.
Mack concluded that the comments made and delusions experienced by Wendis were indicative of schizophrenia, and "would have been hard to manufacture, or make up." Mack found that Wendis was not malingering and was in the grips of a psychotic delusion with auditory hallucinations at the time of the incident. Although Wendis knew that he was killing his father, Mack concluded that his delusions and the voices in his head caused him not to know what he was doing was wrong. In addition, Mack noted that Wendis suffered from a cognitive disorder indicative of mild brain damage. He also opined the psychotic delusions with auditory hallucinations were not drug related.
Dr. Oscar Sandoval, a psychiatrist, examined the medical records from Wendis's hospital stay at Raritan Bay Medical Center from June 11-12, 2004, and said that Wendis should not have been released from the hospital on June 12, 2004. He opined that the "evaluation in the emergency room was just not the standard of psychiatric care." Sandoval testified that, "[w]ithin a reasonable degree of medical certainty, [Wendis] was insane" on June 16, 2004, suffering from paranoid schizophrenia.
According to Sandoval, the totality of the circumstances made it apparent that this had not been a planned act but rather had been spontaneous, characteristic of someone who was schizophrenic or suffering from some other psychosis. Wendis did not know the nature and quality of his act, and did not know he was actually swinging the bat and hitting his father.
Sandoval pointed to February 16, 2005, when an employee of his, Carmen Figueroa, was unable to conduct an interview with Wendis because he "was just too psychotic." Wendis told Figueroa that he was hearing voices instructing him to die and be reborn as his sister's baby. Wendis reported that his dead grandfather had told him to kill his father. The voices also told Wendis "[t]hat the mother was in Mars, and that the father was in Pluto. *1030 Aliens would come and kill the people who did bad things." Wendis told Figueroa that he was unable to remember the homicide; all he could remember was being restrained and escorted out of the house, and seeing his father on the ground in the backyard.
Dr. Richard Saferstein, an expert in forensic science, toxicology, and chemistry, testified that the presence of marijuana in Wendis's urine could not be correlated to intoxication or impairment at the time of the homicide. The absence of PCP in his blood on June 18, 2004, meant that Wendis could not have ingested it on June 10 or 11, 2004, or at any time during the fourteen days preceding the blood screen.
Dr. Louis Schlesinger, an expert in forensic psychology, testified for the State. He examined Wendis in August and September 2005, and learned from the materials provided to him that Wendis had a very strained relationship with his father. Schlesinger reviewed the medical records from Raritan Bay Medical Center. He determined that there was "no evidence of mental disease or defect at the time of the crime." Also, there was no evidence that Wendis's faculties were so impaired from drug intoxication that he could not act knowingly or purposely.
Schlesinger diagnosed Wendis with mild anxiety disorder and mild depression, which he believed was the product of Wendis's "current predicament." He also determined that Wendis suffered from a personality disorder that was characterized by antisocial and impulsive traits. Schlesinger opined that even if Wendis had suffered some form of psychosis in the past, it was not schizophrenia but rather a result of his drug use. The results of the Miller Forensic Assessment of Symptoms test revealed a probability that Wendis was malingering. The Structured Interview Reported Symptoms test showed zero probability that Wendis had provided honest responses during Schlesinger's evaluation.
Dr. Daniel Greenfield, a psychiatrist, also examined Wendis and found no evidence that his cognitive faculties were impaired at the time of the homicide. Wendis had no history of mental illness before the hospitalization on June 11, 2004. The evidence showed that Wendis was fully aware of what he was doing when he killed his father. Greenfield agreed with Schlesinger's conclusion that Wendis was malingering when he claimed to have no memory of the homicide and to be hearing voices.
Greenfield diagnosed Wendis with an adjustment disorder with mixed anxiety and depressed mood. He attributed that condition to Wendis's being charged with the crimes and incarcerated. He disagreed with the defense experts, finding that Wendis was not psychotic when he was observed at Raritan Bay Medical Center on June 11-12, 2004. Finally, he determined that Wendis did not meet the diagnostic criteria for schizophrenia.
Dr. Hugh Moore, the psychologist who screened Wendis at the county jail on June 17, 2004, testified that Wendis was alert and oriented. Moore saw no sign that Wendis was delusional or psychotic. Accordingly, Moore never prescribed any antipsychotic medication for him.
Moore examined Wendis again on July 19, 2004. Wendis told him that he was "playing games" with another doctor at the jail and that he had said things to him that were not true. Wendis wanted to be transferred to a low-visibility unit, and told Moore he was not suicidal. Moore determined that Wendis was stable and recommended that he be transferred to a low-visibility unit.
*1031 Corrections Officer Joseph Rekulak testified that Wendis interacted with other inmates, played chess, watched television, and obeyed institutional regulations while he was in jail. He was polite and respectful to the corrections officers. Rekulak never heard Wendis talk about planets or claim to be hearing voices. Corrections Officer Pedro Delgado also testified that Wendis was respectful to the officers and never presented any problem.
The jury returned a guilty verdict on all counts on October 19, 2006. Wendis's subsequent motion for a new trial was denied. At sentencing, the trial judge merged count two into count one and imposed a thirty-five-year term of imprisonment, subject to NERA parole ineligibility.
This appeal followed.

II.
Wendis raises the following issues on appeal:
POINT I:
THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL AS A RESULT OF THE TRIAL COURT'S RULING PERMITTING THE PROSECUTOR TO QUESTION ONE OF THE EXPERTS REGARDING THE DEFENDANT'S ALLEGED CONDUCT IN COURT WHICH WAS NOT ESTABLISHED AND WHICH PLACED THE DEFENDANT IN AN UNFAVORABLE LIGHT INCONSISTENT WITH HIS DEFENSE. (PARTIALLY RAISED BELOW).
POINT II:
THE TRIAL COURT ERRED IN PRECLUDING DEFENSE COUNSEL FROM ELICITING IMPORTANT INTRINSIC EVIDENCE PURSUANT TO N.J.R.E. 607 WHICH IMPACTED UPON A CRITICAL ASPECT OF A KEY STATE WITNESS'S TESTIMONY.
POINT III:
THE TRIAL COURT ERRED IN DENYING DEFENSE COUNSEL'S REQUEST FOR A BRIEF CONTINUANCE AS WELL AS COUNSEL'S REQUEST THAT THE COURT ISSUE AN ORDER DECLARING ALEX COLON, A WITNESS SUBPOENAED BY THE DEFENSE BUT WHO HAD REFUSED TO APPEAR AT TRIAL A MATERIAL WITNESS, THEREBY PRECLUDING THE DEFENSE FROM ELICITING RELEVANT AND IMPORTANT TESTIMONY FROM HIM.
POINT IV:
THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
POINT V:
THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

A.
In Point I, Wendis argues that his conviction should be reversed because of an exchange between the prosecutor and Mack during the expert's cross-examination and the subsequent reiteration of the exchange during the State's summation. The exchange concerned an incident that the prosecutor asserted had taken place the day before, while Mack was in the courtroom waiting to start his testimony. The incident does not appear on the transcript, and the attendant circumstances make it highly unlikely that it took place in the presence of the jury.
During his direct testimony, Mack had testified that Wendis's "flat affect" was an indicator that he was schizophrenic.
The first thing, there has been a consistent account from the defendant *1032 throughout, that he wasthat he had gone to school, he went home, he was in his room. And the next thing he remembers is that he was grabbed by the police, and his father was dead on the ground. He's been consistent in that statement, has not changed that statement throughout, in any of the records that I saw, and in his report to me. I asked him what happened. He said, "I believe I was in my house. And all of a sudden someone is holding me and grabbing me, and said look what I did, and did I d[o] that. And the police came and put the handcuffs on."
When I asked him the last memory of seeing his father, he replied, ["]when I was walking by him. I believe, he was dead. I [saw] his brain when I walked by him." Now, his [a]ffect, when he was telling me this, was flat.
Q. What is his [a]ffect?
A. [A]ffect is the emotional tone, as reflected by facial expression, tone of voice. His [a]ffect was flat. And we'll get to the significance of what flat [a]ffect means, from a diagnostic standpoint, a little later.
....
... One of the things that is important to me, in my observations, the observations of Mr. Adames, was that there were numerous signs of schizophrenic thought disorder in his account, that would have been hard to manufacture, or make up, by somebody who wasn't knowledgeable and skilled in the fields of psychiatry and clinical psychology. He made numerous kinds of language associations, where he would say one thing, one word, and then say one word, and bring in another word in a nonsensical manner.
That is the best description of schizophrenic-type thinking. And his [a]ffect was flat. He had a flat [a]ffect during the course of talking.... Also, one of the so-called negative indicators, in schizophrenia, both positive indicators, like the delusions, the hallucinations, the disorganized thinking, the fact that the [a]ffect was as flat as it was, was because of the deteriorating behavior. And negative, negative symptoms, like the flattening of the [a]ffect. Not talking and not moving would be like negative symptoms. And a lack of action would be a negative symptom.
The prosecutor commenced her cross-examination of Mack as follows:
Q. Doctor Mack, you remember being here yesterday, late afternoon, before you testified? Correct?
A. Yes.
Q. And prior to you getting up on the stand, you recall being over next to the defendant with [defense counsel], and the three of you were talking and whispering; correct?
A. I don't think I was whispering.
Defense counsel then objected. During the ensuing side bar, the following discussion took place:
THE COURT: What did you say?
[PROSECUTOR]: They were talking very low. I didn't hear what they said. But I saw their faces. They were laughing. The defendant was turned towards them laughing. the three of them were engaged in a conversation. That's what I'm going to ask him about.
[DEFENSE COUNSEL]: Judge, I object. First and foremost, ... I can address my client at any time. That is first and foremost. Second of all, the laughing is her perception. Okay. I'm afraid that her viewing and her perceptions, are going to connote something very negative. I am entitled to speak to my client 24/7.

*1033 THE COURT: But the witness wasn't entitled to talk to him.
[DEFENSE COUNSEL]: There was no sequestration.
THE COURT: Sure, there is sequestration. We said that on the date that the trial started. I always tell everybody.
[DEFENSE COUNSEL]: Judge, he wasn't aware of the sequestration.
THE COURT: You should have made him aware.
[DEFENSE COUNSEL]: He wasn't told.
THE COURT: You should have told him.
[DEFENSE COUNSEL]: I didn't tell him there was any sequestration.
THE COURT: He was wrong to talk to him.
[DEFENSE COUNSEL]: He didn't talk to him. He, basically, greeted him, and that's it.... And I'm afraid that, taken out of context, what the Prosecutor is trying to do is show some kind of deception. And that is wrong, Judge. As I said, Judge, before, as Counsel, I'm entitled to speak to my client as many times as I deem fit. The fact
THE COURT: Yeah.
[PROSECUTOR]: You are not entitled to talk to him with somebody else present in the whole courtroom.
[DEFENSE COUNSEL]: Basically, he was present when I was speaking to Wendis.
THE COURT: No. No. We're talking now about whether you and Wendis and this doctor had a conversation. We are not talking about the whole courtroom. That's what we're about here.
It is improper for you to talk to Wendis
[DEFENSE COUNSEL]: He said, "hello."
THE COURT: She can ask him that.
Without conducting a hearing pursuant to N.J.R.E. 104(a) with respect to the proposed cross-examination or its factual basis, the trial judge overruled the objection and allowed the prosecutor to proceed.
Q. So, Doctor, yesterday when you were over there, speaking with Mr. Adames and his attorney, Mr. Adames was actually turned towards you; correct?
A. I think so.
Q. And he looked up at you?
A. I don't specifically recall. I know that I looked at him.
Q. And he had a smile on his face; isn't that right?
A. I wouldn't say so.
Q. You wouldn't say that he was laughing at some joke that the three of you were engaged in?
A. No. Totally not. It wasn't in that context at all.
[Defense counsel]. Objection.
The Court: Overruled.
Q. But do you recall him turning in his seat and actually
A. As I recall
Q. looking towards you, in your direction then?
A. I said, "hello," and I asked him if he was on his medication at that point. That's all I said.
During her summation, the prosecutor commented more generally on Wendis's conduct during the trial, and again specifically mentioned the alleged interaction between Mack and Wendis prior to the start of Mack's testimony:
[W]e've been here for a long time and we've had opportunities to observe Wendis sitting over there and in terms of any type of schizophrenic behavior have *1034 you seen him acting like he's responding to internal stimuli? Have you seen him reacting to people that aren't there? Reacting to voices that are up here in his head? Which I submit are not inner thoughts, but what sounds like I'm talking to you? ....
... And again what we've observed is the defendant sitting over there hands folded in his lap. Occasional bouncing of the legs. No talking to himself. And don't forget Doctor Mack, we began his testimony on a Wednesday, however many weeks ago in the afternoon and around three p.m. took a break, and then the next day Thursday he came in nine o'clock started up again I believe about an hour or so more of his testimony and then on cross examination I asked him whether or not he recalled the afternoon before when he was over at the side talking and laughing and smiling and he couldn't recall Wendis laughing and he couldn't recall Wendis tilting his head up, nor could he recall Wendis turning his body around. This is a psychologist. Just the afternoon before but couldn't recall whether or not that happened.

[(Emphasis added).]
There was no objection to the prosecutor's remarks, although we note that they related, in part, to the same incident as to which two objections had previously been overruled.
Wendis argues that his right to a fair trial was fatally compromised by the prosecutor's conduct because the prosecutor (1) improperly commented on his non-testimonial demeanor and conduct during the trial and (2) improperly undercut the credibility of his expert witness on an important issue related to his defense.

B.
The disputed cross-examination and summation involved, in part, Wendis's demeanor and conduct while sitting at counsel table. Wendis's interaction with Mack, if it did not take place in the presence of the jury, was not properly brought to the attention of the jury by the prosecutor. Even if it did occur in the presence of the jury, which appears unlikely, it did not rise to the level of conduct that would trigger the very limited right to comment on the demeanor or conduct of a non-testifying defendant permitted under State v. Rivera, 253 N.J.Super. 598, 604-05, 602 A.2d 775 (App.Div.), certif. denied, 130 N.J. 12, 611 A.2d 650 (1992). The same is true of Wendis's general conduct at trial, which the prosecutor referred to in summation.
In Rivera, supra, 253 N.J.Super. at 604, 602 A.2d 775, we held that a prosecutor should not ordinarily be permitted to comment on a non-testifying defendant's demeanor or behavior during trial. We then set forth a fairly narrow exception with attendant safeguards, none of which were applied in this case.
We can, however, reach what appears to us to be a reasonable guideline for trial judges. We determine that if a defendant attempts to inject his unsworn comments into a trial by word, gesture, display of emotion, or other demeanor, such an affirmative act may fairly be the subject of limited comment noting the fact of the behavior and that the comment or demeanor should not be considered by the jury. There may be no reference to defendant's failure to testify under oath. Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106, 109 (1965), reh. denied, 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965); State v. Schumann, 111 N.J. 470, 477, 545 A.2d 168 (1988). The court should charge concerning the fact of defendant's assertions or demeanor, advising *1035 the jury that they should not be considered. Where, however, the asserted demeanor is clearly passive, there should be no comment. State v. Johnson, [] 120 N.J. [263,] 295-96, 576 A.2d 834 [(1990)].
Where the evidence of a display of emotion is active, the trial judge is faced with a difficult decision. Did the defendant cry or laugh voluntarily? Can the action correctly be interpreted as nervousness, sadness, fear, remorse, glee, irony or some private emotion? The better rule in such cases is to prohibit any comment by the State unless the demeanor evidence is clearly injected as an unsworn attempt to influence the jury. A pleading type of crying directed at the jury may be a clear appeal for compassion or sympathy, and might justify some appropriate comment. A tearful sob during adverse testimony may not justify any comment.
An absolute rule of prohibition might hamstring the State in the presentation of its case, giving a defendant free access to the jury without comment by the State. There is a difference, however, between commenting upon the fact of the behavior (as in the case before us), and casting aspersions on the defendant's choice not to testify. We direct, therefore, that in each situation a record be made of the behavior or statement by defendant before the State's comment, State v. Farrell, 61 N.J. 99, 102 n. 1, 293 A.2d 176 (1972), and that the court pass upon the State's intended comment before it is made. Cf. R. 1:7-3. In most cases a simple charge to the jury that it should disregard the defendant's comments or demeanor will suffice. Only in the clearest cases should the State be permitted some responsive comment, and then the comment must not infringe upon defendant's right not to testify.
[Id. at 604-05, 602 A.2d 775.]
See also State v. Johnson, 120 N.J. 263, 296-97, 576 A.2d 834 (1990) (holding that it was improper for a prosecutor to point out during summation that a defendant failed to make eye contact with the jury).
Here, during her summation, the prosecutor commented on (1) Wendis's failure to act during the trial as if he were hearing voices and (2) his interaction with Mack during a lull in the proceedings. Neither can reasonably be characterized as the type of "unsworn attempt to influence the jury" by a non-testifying defendant that we referred to in Rivera. The conversation with Mack likely took place when the jury was not present, and, even if the jury were present, the prosecutor characterized the discussion as "whispering," making it unlikely that the conversation was meant for the benefit of the jury. In addition, the prosecutor never sought to make a record of the incident at that time and never cleared her summation comment with the trial judge before it was made, as required by Rivera.
The State argues that Wendis "clearly inject[ed] his behavior/demeanor during the trial into the case" for the purposes of Rivera by presenting an insanity defense. We disagree. Rivera requires significantly more than mere reliance on an insanity defense before prosecutorial comment on a non-testifying defendant's demeanor or conduct at trial is permitted. There must be some affirmative effort by the non-testifying defendant to influence the jury through words or conduct. Indeed, our opinion in Rivera, supra, 253 N.J.Super. at 605, 602 A.2d 775, permits prosecutorial comment only in the "clearest cases" and only when a simple jury instruction would not be sufficient.
The State has not cited, and we have not found, any binding precedent to *1036 support the position that once a defendant's sanity is raised as an issue at trial, the prosecutor is free to comment on a defendant's non-testimonial behavior or to make unsworn statements as to that defendant's conduct during the proceedings, especially when it occurred outside the presence of the jury. On the contrary, as we recognized in State v. Gould, 123 N.J.Super. 444, 449, 303 A.2d 591 (App.Div.), certif. denied, 64 N.J. 312, 315 A.2d 401 (1973) (emphasis in original):
Trial judges usually instruct jurors ... that they should observe the demeanor of all witnesses who testify as an aid in determining whether a specific witness testified truthfully. Here defendant chose not to testify as was his constitutional right. Despite this, and despite the fact that defendant's conduct during the trial was proper, the prosecutor sought to have the jurors take into account his physical characteristics as an evidentiary fact of guilt. Demeanor becomes an issue for a jury only if a witness takes the stand and testifies before the jury, and may be used by the jurors as one of the tools to test the witness'[s] credibility. There is no known principle of law which permits jurors to judge innocence or guilt in this manner.
As the Supreme Court held in State v. Bey, 129 N.J. 557, 620, 610 A.2d 814 (1992) (emphasis added), "a prosecutor's closing argument must be limited to the facts in evidence and inferences reasonably to be drawn therefrom."
Cases in other jurisdictions have addressed the issue differently, with some states allowing such comment and others precluding it. We believe the better view is the one we adopted in Rivera, which we follow in this case. See State v. John B., 102 Conn.App. 453, 925 A.2d 1235, 1243 (2007) ("For the prosecutor to have relied in argument on the defendant's courtroom demeanor was not proper because it constituted argument on matters extrinsic to the evidence."); Hughes v. State, 437 A.2d 559, 572 (Del.1981) ("[T]he courtroom demeanor of a defendant who has not testified is irrelevant. His demeanor has not been entered into evidence and, therefore, comment is beyond the scope of legitimate summary."); State v. Smith, 91 Hawai`i 450, 984 P.2d 1276, 1286 (Ct.App.1999) ("Unless and until [defendant]'s reaction during the trial was lawfully introduced as evidence, it was not a proper subject for argument to the jury."); Bryant v. State, 129 Md.App. 150, 741 A.2d 495, 501 (Ct. Spec.App.1999) ("We do not understand this statement ordinarily to condone comments of the prosecutor on the passive courtroom demeanor of a non-testifying defendant."). But see Wherry v. State, 402 So.2d 1130, 1133 (Ala.Crim.App.1981) ("The conduct of the accused or the accused's demeanor during the trial is a proper subject of comment.").
We recognize the impossibility of eliminating the jury's consideration of a non-testifying defendant's demeanor and behavior during trial, particularly when the defendant's mental health at the time of the crime is the only question posed to the jury. However, such impossibility does not open the door for the prosecution to comment on a defendant's behavior or demeanor, except in circumstances not present here. See Rivera, supra, 253 N.J.Super. at 604, 602 A.2d 775. See also State v. Daniels, 182 N.J. 80, 99-100, 861 A.2d 808 (2004), stating:
[T]he State cannot call the jury's attention to the defendant's presence at trial, a place where the defendant is constitutionally authorized to be. See Portuondo v. Agard, 529 U.S. 61, 87, 120 S.Ct. 1119, 1134, 146 L.Ed.2d 47, 67 (2000) (Ginsburg, J., dissenting) (recognizing *1037 that "a prosecutor's latitude for argument [may be] narrower than a jury's latitude for assessment").
We also note that the primary issue for the jury in this case was the state of Wendis's mental condition at the time of the homicide, not at the time of trial. N.J.S.A. 2C:4-1 provides, in part, as follows:
A person is not criminally responsible for conduct if at the time of such conduct he was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know what he was doing was wrong.
That Wendis did not have a flat affect or was not hearing voices at the time of the trial does not necessarily mean that those diagnostic criteria were not present at the time of the homicide or when he was examined by Mack.

C.
The State also points to the generally broad scope of cross-examination permitted at trial. "[O]rdinarily, the scope of cross-examination of a witness rests in the discretion of the trial judge. An appellate court will not interfere with the exercise of such discretion unless clear error and prejudice are shown." Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J.Super. 37, 54, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990). We also recognize that "an expert witness is always subject to searching cross-examination as to the basis of his opinion." Ibid.
The prosecutor's questioning of Mack about Wendis's conduct during the break, which involved his affect in the courtroom, directly challenged one of the factors Mack had considered in reaching his diagnosis that Wendis was schizophrenic at the time he killed his father. A challenge to the factual basis of an expert's opinion is, of course, generally permitted as part of a "searching" cross-examination. Here, however, the specific factual assertions concerning Wendis's demeanor, which were the premise of the prosecutor's questions, were not part of the record. Consequently, the questions themselves were tantamount to unsworn testimony by the prosecutor about Wendis's behavior the prior day. See State v. Farrell, 61 N.J. 99, 102-03, 293 A.2d 176 (1972). The broad scope of cross-examination does not include the right to present unsworn testimony to the jury as part of the questioning.
The harm caused by the prosecutor during Mack's cross-examination was significantly compounded when she raised the same issue again and commented generally on Wendis's demeanor during her summation. It is clear from the testimony quoted above that Mack denied that Wendis was smiling or laughing during their exchange the prior afternoon. Consequently, the prosecutor's second assertion to the contrary during her summation directly and improperly pitted her recollection and credibility against Mack's. As we pointed out in Scheri v. DePaolo, 68 N.J.Super. 297, 304, 172 A.2d 233 (App.Div.1961), "[t]here is always the risk that the `information' being relied upon by the cross-examiner is inaccurate, and that pursuit of the inquiry will be prejudicial to the other side, since juries sometimes assume that `facts' referred to in questions are true even when denied by the witness under cross-examination."

D.
To determine whether prosecutorial misconduct warrants reversal, we must assess whether the misconduct "was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, *1038 83, 727 A.2d 1 (1999) (citations omitted). In making this assessment, we must consider "the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred." State v. Timmendequas, 161 N.J. 515, 575, 737 A.2d 55 (1999) (citations omitted), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001). The prosecution's duty to achieve justice does not forbid a prosecutor from presenting the State's case in a "vigorous and forceful" manner. State v. Ramseur, 106 N.J. 123, 320, 524 A.2d 188 (1987) (citation omitted). Indeed, the Supreme Court has recognized that "criminal trials create a `charged atmosphere ... [that] frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.'" Ibid. (quoting State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739, cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958)).
We conclude that the prosecutor's references to Wendis's demeanor during summation and her direct attack on Wendis's defense through the use of her own unsworn testimony rises to a level of impropriety sufficient to deny Wendis his right to a fair trial. "No matter how seemingly evident the guilt of the accused, he is entitled to a fair trial surrounded by all substantive and procedural safeguards our legal heritage has provided." State v. Sachs, 69 N.J.Super. 566, 578, 174 A.2d 605 (App.Div.1961).
In this case, there was conflicting testimony from mental health experts on the issue of Wendis's sanity at the time of the homicide, all subject to the jury's evaluation. We are convinced that the prosecutor's general comments on demeanor and introduction of the issue of Wendis's conduct through her own factual assertions, followed by its repetition during summation in a manner contrasting her credibility with Mack's, possessed a clear capacity to mislead the jury, thereby precluding Wendis from his right to a fair trial. "[B]ecause defendant's guilt depended entirely on which experts the jury believed," we conclude "that the inappropriate comments made by the prosecutor could have improperly swayed the jury and denied defendant a fair trial." State v. Smith, 167 N.J. 158, 187, 770 A.2d 255 (2001).
To the extent some of the issues upon which we base our reversal were not raised during the trial, we find that they constitute plain error, i.e., "`error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" State v. Papasavvas, 163 N.J. 565, 626, 751 A.2d 40 (2000) (quoting State v. Timmendequas, 161 N.J. 515, 576-77, 737 A.2d 55 (1999)).

E.
In light of our decision to reverse Wendis's conviction and remand for a new trial, we need not reach the remaining issues raised on appeal.

III.
In summary, we reverse and remand for a new trial on the basis of the prosecutor's questions, statements, and arguments concerning Wendis's alleged in-court conduct.
Reversed and remanded for a new trial.
NOTES
[1] For the sake of clarity, individuals who share the same last name are referred to by their first name throughout the opinion.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).